Good morning. Good morning. Good morning. May it please the Court, my name is Kay Nordhunt and I represent the Appellant Cross Appellee International Insurance Company, now known as TIG Insurance Company. Appellant agrees with the District Court's rulings in this case that are before the Court this morning, except for the ruling that H.B. Fuller Company v. International Insurance Company has a $1,000 retention ruling that there is but one occurrence. The District Court states, if Minnesota courts were presented with this case, it would determine the number of occurrences by looking at the underlying cause and then held the cause as a singular continuous manufacturer of asbestos-containing materials, thus one occurrence. The District Court's ruling is wrong. Minnesota courts have been presented where an insured seeks coverage for claimants alleging injury from exposure to a formulated manufactured product which contains a harmful chemical substance. Minnesota courts have rejected the ruling here that there is one occurrence and that the event is the manufacturer. The Minnesota Court of Appeals in in-ray silicone implant insurance coverage litigation reversed the trial court's ruling, treating as one occurrence the manufacturer of breast implants from which multiple claimants sought damages from the manufacturer. Where multiple claimants are injured by exposure to a formulated product, for each complainant that's injured, there is an occurrence. No Minnesota court has held to the contrary since the in-ray silicone implant in the intervening years, and as set out in our brief at page 36, such was the same holding in February 2004 by the state court judge assigned in Minnesota to handle insurance coverage disputes for asbestos injury claims. If this case were in the Minnesota state court, there would not be the ruling that there is one occurrence. All of the cases on which H.B. Fuller relies, the Minnesota court decisions and federal court decisions purportedly applying Minnesota law were all decided before the Minnesota Court of Appeals so ruled in the in-ray silicone implant insurance coverage litigation case. The district court relied on NSP, which involved continuous pollution contamination at a particular geographic site with a single claimant which was treated as one occurrence. Given the facts in NSP, it would be hard pressed to reach a different result. You have one claimant who was seeking a recovery of damages due to the continual discharge of contaminants into the site. The Supreme Court in determining the number of occurrence also looked at the injury, the continuous soil and water contamination. If the timing of the decisions were reversed, so let's say in-ray silicone was decided before NSP, you'd have exactly the same ruling as NSP. I mean, NSP is, again, a single claimant, one site, continuous pollution contamination discharge. In the NSP case, the Minnesota Supreme Court mentions in passing the Agent Orange decision in Unaroyal. That decision, as the court is well aware, has since been rejected by the New York courts, which New York law was what the federal district court in Unaroyal was purporting to apply. In Unaroyal, you were dealing with a sale of herbicides to one party, which was the United States military. The New York court did not hold that the manufacture of the dioxin contaminated herbicides was the occurrence. Rather, the occurrence they held was the delivery to the military, the single purchaser. In large part, the New York court held it was ruling as it did because it was a military contract. Talked about the fact that it probably would look at it different if it was in the civilian sales contract context. Like NSP, the court mentions the unique nature of the circumstances before it. In any event, the Minnesota Court of Appeals, when it was addressing the issue of the number of occurrence, was well aware of the NSP case and ruled as it did. Moreover, if it was the intent that all asbestos claims would be one occurrence, the policy would have been written to be provided for just 100,000 self-insured retention versus the per-occurrence language, which would simply be unnecessary if that is the way it's construed. Now, because of the district court's ruling that somehow there was only one occurrence, it did not address whether a pellet could somehow be bound by the Fuller and National Settlement Agreement. The answer to that question is TIG is not bound. The district court correctly ruled that by its very nature and the terms of appellant's policy, its coverage is not triggered until the underlying primary policy is exhausted according to its terms. And the National Union primary policy is not even triggered until Fuller's insured retention of 100,000 per occurrence is exhausted. National Unions and Fuller's settlement agreement does not bind appellant. In their brief, the respondent talks about the follow the fortune doctrine based on reinsurance agreements. This is not a reinsurance situation. Minnesota has never applied the follow the fortunes doctrine. And where you see that being applied even in the reinsurance context, it is based on the terms of the contract. There is no such terms here. Each argument that, any such argument that somehow TIG is bound is also contrary to condition O of TIG's policy. The parties tethered appellant's coverage obligations to the satisfaction of Fuller to the terms of the National Union policy. So what we're asking this court this morning is reversal of the district court's denial of partial summary judgment. And it's ruling that there is but one occurrence. With the one occurrence being the manufacturer versus there are multiple occurrences with the occurrence being each claimant's exposure subject to the $100,000 each occurrence limit. So what we're asking of this is a court reverse and a so rule. Okay. Thank you very much. Ms. Hunt. Ms. Lonergan. Good morning. May it please the court. I'm Lauren Lonergan, representing H.P. Fuller Company. I'm first going to address the number of occurrences issue and then we'll move on to the insolvent years issue. The parties have presented the court with just two stark alternatives here and I think it's important to note that. And the first one is to affirm Judge Thunheim's ruling that under the facts of this case, the decision to manufacture and release into the stream of commerce was so continuous that it constitutes a single occurrence. The other alternative is to find that each plaintiff's injury as a separate occurrence. The parties, in particular TIG below, didn't present any evidence of any other cause. So while in their briefs they raised the question of there could be other causes or other districts have found a different cause, there was no evidence of any other cause presented here. So those are the two alternatives that the parties have presented to the court. NSP is the only Minnesota Supreme Court case that is on point in this matter. NSP was an environmental case in which the NSP was attempting to argue that there was a single occurrence involved for purposes of a $50,000 per occurrence retention. And the court said, like the federal district court in Agent Orange, we have concluded that the discharge or escape of coal tar and oxide contaminants has been so continuous and repetitive that the unidentifiable individual instances have merged into one occurrence. The focus was on the discharge, in other words, the conduct of NSP. Unaroyal, as Ms. Hunt noted, is also a single plaintiff case. But again, if you look at the reasoning of the court, it didn't matter how many plaintiffs there were. The focus was on the cause of the injury. And in that case, the court found that the cause was the release into the stream of commerce of Agent Orange. They mentioned that the Second Circuit didn't follow Agent Orange, but what is important here is that the NSP court did. And no Minnesota Supreme Court since that time has ruled otherwise. No one in Minnesota, no district court or Minnesota Supreme Court has rejected Agent Orange. So the citation in the NSP case is still good law in this district. In Domtar, which was a Minnesota Court of Appeals case, it's unreported, that's true. But in that case, again, the court didn't find that the insured had proved that there was a single cause. But the analysis of the court shows that the Domtar Court of Appeals felt that was the test here. They said that because the insured had not shown a single business practice led to the contamination, there was more than one occurrence. But the clear implication is, had the insured showed there was a single business practice that led to the injuries, they would have found a single occurrence. Well, that evidence has been presented by H.P. Fuller here. So both NSP and Domtar support H.P. Fuller's position. Is this a factual determination because NSP had a discharge, but here you have, is the district court making a factual determination that it was one continuous matter or, which is a little hard to believe because each time you manufacture something and put it out there, it's a little different, but. Yes, Your Honor, they are, and that's actually, it is a factual determination, but there's been no evidence propounded by TIG International to the contrary. And the case law shows that the focus is on, was the insured's conduct so continuous? So is the entry into the stream of commerce, for instance, in the Unirol case, that was the test that the court used. And they found in that case, the delivery was a single occurrence. But in this case, Judge Two-Nine found the manufacturer was the single, continuous, repetitive conduct that gave rise to a single occurrence. Domtar, they've mentioned the, what we call SBI-1, which is the Minnesota Court of Appeals. Sure, of course. I guess the question is, is what is our review? If it's a fact finding, we'd have to say, is our review clear air? Or, I mean, everybody seems to argue this is more of a legal argument in how you interpret this. That's what, that was the point of my opening remarks, Your Honor. There's been no evidence of anything else here. The International below didn't contest Fuller's position that if there's a cause, there's a single cause. They presented no evidence to the contrary. And were this court to try to remand to say, well, what was their continuous conduct? This was a Rule 56 motion. They had the obligation at that point in time to provide the evidence to rebut H.P. Fuller's evidence, and they did not put anything forward. So if the court were to think, well, maybe there's more than one cause, we're going to apply the cause test. But could there be more than one cause? On remand, TIG is not entitled to present evidence, because they didn't present it in the Rule 56 motion. The SBI case is a case, true, that it was decided, but it doesn't mention NSP. Now, of course, we don't know what was argued in that case, but it never talks about NSP at all. So it just simply doesn't address the NSP situation. TIG makes much of the fact that there are multiple plaintiffs here, there were not an NSP. But I think it might be helpful to the court to think about it this way. If one driver causes a crash and there are many plaintiffs, so there's a single crash, multiple plaintiffs. I think most people would say there was a single accident. If the same plaintiff is injured in two different car accidents, we would say there are two accidents. That common sense example tells you that like the courts in this case, NSP and otherwise, you're really focused on the conduct of the person accused of how many of the accident. How many accidents were there? Well, in this case, there was one decision to manufacture. It is the majority rule to apply the cause test. And this court in the Cargill case, which was an affirmance of a Minnesota district court case, did in fact follow it. Cargill was a case where like here, the district court found that the decision, a single decision to reformulate the product was a single cause. So the Minnesota cases that are directly on point support Judge Thunheim's decision. Walser, a case not even mentioned by Ms. Hunt, is also important here. They've made much of SBI, which is a court of appeals decision, Genoff, which is a case decided in 1997. But in 2001, the Minnesota Supreme Court decided to revisit the question of how you determine what constitutes an occurrence. And they did so because of all the confusion in the various Minnesota appellate decisions about what that means. In that case, the court said, the word accident encompasses both the acts of the insured and the consequences of the insured's acts. And in that case, that was the case where the boys were playing basketball. One went up to dunk, one grabbed his leg, he fell and he hurt his finger. So you had conduct of the insured, the pulling of the leg, the consequences of that, the fall, and then you have the injury. And if you read the court's opinion, what they were focused on was the nature of the insured's conduct. They said whether there's an accident depends on whether the insured intended the conduct, pulling the leg, and also whether they intended the harm. But again, in that case, the focus is on the insured's conduct. It's not on the exposure or the injury of the plaintiff. And so, Walser supports Judge Thunheim's decision, and it is the most recent Minnesota Supreme Court case on the question of what constitutes an occurrence. It's not in this context, but it is intended to be the Minnesota Supreme Court's articulation of what the standard is in Minnesota. The policy language also supports Judge Thunheim's decision. It says accident that results in bodily injury. And as many of the cases have said, it tells you that there's a distinction between the accident and the injury. And well, to have liability, you have to have injury. The accident is not the injury. And so, many cases interpreting this, and the majority of cases following the cause test, look to that language to say, you have to look to the cause of the injury. Likewise, per occurrence, they've made an argument that per occurrence must mean there can be more than one occurrence. But in endorsement number three to the National Union Policy, where this retention is set forth, they talk about, they don't use the word per person. If they'd wanted to say it was $50,000 or $100,000 per plaintiff, they should have said per person. Per person is a normal insurance terminology used to denote limits and retentions that apply to each individual plaintiff. They did not use that word here. Finally, I want to just turn to the reasonable expectations of an insured. Now, I'm not suggesting the court apply the reasonable expectations doctrine. But the test in Minnesota for reading an insurance policy is, what would a reasonable insured in the position of, the reasonable person in the position of the insured understand the language to mean? Here, this wasn't a retention that shows there was an expectation that there would be coverage for asbestos claims. It's not an exclusion, it was a retention that clearly showed that there was an intent to cover asbestos claims. And the TIG 30B6 representative said in his deposition, as TIG had indicated, we believe that every occurrence, and by the definition, you've got thousands of occurrences here, and under Minnesota law, we don't see how that SIR would ever have been exhausted that's written in the National Union Policy. TIG's representative admitted in his deposition that were their interpretation to be accepted, there would never be insurance coverage under the National Union Policy, and there would never be insurance coverage under the International Policy for asbestos claims. Any reasonable insured in the position of HB Fuller would expect that that endorsement would be read in a way that at some point would allow there to be coverage for asbestos claims. I'd like to turn to the insolvent years issue. The- Insurance is a product liability claim. Let's say you have a defective automobile, which you used that example, and it's producing everyone coming off the assembly line as a problem, and some people get injured, there isn't one occurrence there. Each injury is an occurrence. I would disagree, Your Honor, because for two reasons. One, you have to focus on the insured's liability. In other words, what's the basis for our liability? It really is the decision, or the unwitting manufacturer of a product of an injury. Have you ever heard of a case where you had a defective car that was made, and it would be, continuously made this defective car, and each, and that was just one occurrence? Yes, Your Honor. It really, if you read the cases carefully, if you look at, for instance, the Cargill case, it was a formula. It could have injured any number of people, and under the Cargill decision, it would be one occurrence. But moreover, Your Honor, if you think about what happens after the car leaves the plant, there are all sorts of things that can happen. Let's suppose it's defective brakes. And the reason that someone is in an injury is because the person in front of them does something they shouldn't have done, and there's an accident, and there's a small contribution by the brakes. It's, the occurrence really is not the situation where the insured had no control over it. Fuller here had no control over how the products were used once it left the plant. And in the same situation that occurs in the accident context, we're talking about brakes, Fuller doesn't control that scenario. And so, when you're looking at what the insured's liability is, and this is liability insurance, you really have to go back to the place and time where the conduct of the insured took place. And so here, that conduct was the decision to manufacture asbestos containing products. I understand your argument. Sure. In this, with respect to the insolvent years aspect of the case, we're seeking a declaration that under the facts of this case, four insolvent years from the 1979 to And I think it's important to note that this is an allocation issue, not a trigger issue. And I'm sure the court's familiar with the allocation. But really, it's helpful to remember that first you have to determine whether a policy is implicated at all in a given situation. Once it's implicated, then you have to address the question of how much does it have to pay? And in Wooddale, the courts, it was true that it didn't involve insolvent years questions. But the court did not know why the insured didn't have insurance after 2002. And so what it did was to set up a principle for the court on remand to consider. And the court said, we therefore conclude that the total period over which liability is allocated must include any times during which damage occurred, but Wooddale was voluntarily self-insured. That's the focus of the court's decision, because it didn't know why it wasn't insured. The question was, what is it voluntarily self-insured? And I think it's good to ask oneself, if you were the trial court on remand and the insured came in and said, well, the real reason we don't have insurance coverage is our carrier was insolvent. What would you have done? I think in light of the court's focus on voluntary self-insurance, or the deliberate decision to self-insure, if the reason you didn't have it. But this is an exception to the general rule in Minnesota. And the question is, who do you shift the burden to in the other insurance companies? They didn't voluntarily insure this time frame either. Well, that's why I said it's important. The only one that took any affirmative action was Fuller, who apparently, rightly or wrongly, picked a company that was not in a good financial situation. Well, certainly didn't know that at the time, because all these carriers were approved to do business in the states in which they were doing business, including Minnesota. And the insurance commissioner had to review those financial statements. The commissioner is in a much better position than Fuller to determine the financial capacity of those carriers, and they approved it. But more importantly, you have to go back to the concept that this is an allocation issue, not a trigger issue. And Minnesota has said that once an insurance company's policy has been triggered, the question of how much it pays, allocation, is a flexible concept. And for instance, in NSP, they decided they were going to prorate it equally across all policy years. But not all damage took place in all policy years. It was not equally distributed. We know that from the facts. In 1928, when NSP began using the site, and in 1933, when it began using the adjacent site, it didn't immediately dump all the product that later leached into the groundwater. It took a long time, it used the sites. It disposed of product, and progressively, the amount of contaminants leaching into the groundwater increased over time. There was not an equal distribution of damages. Nonetheless, Minnesota, applying its flexible allocation principles, made it clear that you can, in fact, require an insurance company to pay more than the exact amount of damages that take place during this policy year. And if you look at the Wooddale decision, even if we're assuming it's just limited to market availability, still, under that concept, you are asking carriers to pay for damages that take place outside their policy year, period. So, Minnesota has, despite what it has sometimes said, in fact, has followed a different rule. And it is said that when you follow a different rule, it is determined by looking at, essentially, the impact on the insured. In NSP, the reason they did it the way they did it was because, as a matter of public policy, it would be too difficult to expect the insured to prove the exact amount of damage that took place in each policy year. And in Wooddale, they've announced this- To the absurd, let's say an insurance policy they have for one year, and then they have another company for ten years, that company for ten years goes bankrupt. Does that mean that the insurance company that had it for one year now has responsibility for 11 years? Yes, Your Honor, and it's not that far-fetched if you look at the policy language. What the policy language says is the insurance company is responsible for all sums for which the insured is liable. In other words, it's not, their own policy language allows that kind of an allocation under that scenario. Well, let's assume that one that's solvent is the one after ten years. Why would anybody go on a risk where they know that their insurance, that the company before them might have questionable solvency? How would you even get insurance? Because that new company would maybe be picking up ten years of risk. They could write a policy that clearly said they wouldn't pick it up, which they did not do in this case. I don't know how more clear you could make them to say this is the policy period that we're covering. There actually are policies out there that describe how you're going to allocate damages, the principles to be used. And so they could have done that here. And just so the court understands, there are many states in the country which require, which allow the insured under that all sums language to pick one policy year and expect that that policy year respond in total to any claim that triggers their policy. Even if there are other policy years that are also triggered. So it's not unreasonable, and it's not out of the realm of the expectations of the insurance companies in this context. Because they have been asked to do that in other cases as well. But I think some of those, Minnesota follows kind of a little different than, you know, the time and the risk method is a little different than I think what you're talking about there. It is, Your Honor, and I'm not saying otherwise. But over time, as the court has realized the impact of the ruling on the insureds, they have basically come back from that and reduced the impact. They no longer allocate all policy years in which there is no insurance to the insured. They're doing it certainly after 1985, and we're asking that the court. Well, it's hard for you to ask us to anticipate the direction that Minnesota courts are going without Minnesota courts doing it. because we're just trying to guess where they are. You tell me, we're in a situation we have to take what they have on the books right now. Not where we might think they're going. I think you have to look at Wooddale, Your Honor, and see that the principle enunciated in Wooddale is that we are not going to allocate to periods where the insured is involuntarily self-insured. Only if they are voluntarily self-insured. And while it didn't absolutely include an insolvent years context, the court didn't know what the real context was and announced that principle and directed the trial court to follow it. To me, that's clear direction that if the insured is not voluntarily insured, whereas here we're fuller paid hundreds of thousands of dollars of premiums and bought millions and millions of dollars worth of insurance coverage, that the insured was not voluntarily self-insured, it did not. I think we've got your, understand your argument. Thank you. Thank you, Your Honor. Time's expired. Thank you, Ms. Lonergan. Mr. Eagleton. Elgarton. Elgarton? Thank you. Elgarton, no, I'm sorry. Good morning. Very close. I'm responding for the insurers solely on the issues raised in Fuller's cross appeal on the pro rata allocation period. I believe Ms. Hunt has reserved a few more moments to talk about the occurrence issue for the TIG insurance company. So I'm speaking solely on the allocation issue at this point. In our view, as you know, we believe Judge Tunheim had this exactly right. And since on oral argument I heard my learned colleague talk about Woodale, I'm going to focus on that case first. But as you know, Woodale is the last in a long line of cases in which Minnesota has very clearly laid out what the principles are. And those principles in favor of pro rata allocation are actually diametrically opposed. It's a rejection of what was called the all sums approach, which every insurer is liable for everything. And we're going to go with the most favorable interpretation for the policy holder that is imaginable. That is exactly what was rejected in NSP, in Domtar, in this court's decision, of course, in Diocese of Winona. And it was rejected as well in Woodale. Then I'm going to talk about whether this court should create a new exception that Minnesota has not created for insolvency. And then I'll talk a little bit about the public policy notions that are floating around. This notion that Minnesota's going to be changing the law in the future to accommodate a greater recovery for the policy holders. Judge Tunheim's ruling was that ordinary principles of pro rata allocation, as explained by the Minnesota Supreme Court, applied here. And therefore, the allocation period included all the periods in which injury took place, including the periods 1980 to 1984, and it included an allocation to all the risk bearers in the year. There are two pieces of the allocation puzzle. One, when did injury occur? Each insurer pays for injury during its policy period. As Minnesota Supreme Court, no insurer pays for injury outside the period. Then you allocate, not to years, but to whoever assumed the risks associated with that policy period. And an insurer in the 1970s, say 1978, assumed the risks of injury during the 1978 period. It did not assume the risks of injury in 1984. It did not assume the risk that in 1984, Fuller would elect, when it went about to buy insurance, to choose the wrong insurer. One that turned out to be financially unstable, as it turned out. The insurer in 1979 has no control over that decision. What was the holding of the Woodell case? Well, the holding of the Woodell case is not obscure. It is exactly as described in the case itself. The court said, and I'm going to quote, so I'm going to look down on my page here. The court said, on appeal, Woodell claims that it was unable to purchase water intrusion insurance after November 2002. We hold that on remand, if Woodell establishes that no water insurance coverage was available to it after November 2002, the total period over which liability was allocated ends at 2002. Available to it, they couldn't purchase it. This is called the unavailability exception. And what it refers to is the transfer of risk. And just to point it out further, that this is Woodell's holding. The court further describes it later, says the issue is the period over which the damages are to be allocated excludes periods during which the insured lacked coverage because no such coverage was available. So it is as clear as day as a matter of the holding of that case, that they were invoking the unavailability exception as it had previously been discussed in the Stonewall case. Which is that we will exclude periods during which insurance was categorically unavailable on the marketplace. And that's all that was held. The quote here is to the word voluntary, and that is taken clearly out of context. The voluntarily self-insured word here was a distinction the court simply made. It was simply saying, Woodell says there was no insurance available to it. And thus the issue was, well, or did it voluntarily not buy the insurance? That was the only context in which the word voluntary was used in that context. So the holding of Woodell does not help at all. Should the court create a new exception? The answer is no. There is no insolvency exception. Why? Because we know from the basic principles of Minnesota law how this is to be worked out. There are two issues, as I said. The first, they look at the terms of the insurance policy. Insurers are liable for injury during their policy period, not injury outside their policy period. That's covered by some other insurer in some different year. The second issue you look at is allocation of risk. First you determine when the injury took place, then you say, who had the risk for that period? And in this case, the risk is actually not primarily Fuller's. It was secondarily Fuller's. The primary risk here, this is an ordinary allocation case. There are insurers that assume the risk for the periods 1980 through 84 under the policies they issued to Fuller. So we're not really dealing with a self-insured issue, which is what Fuller says, or voluntary self-insurance. You're dealing with allocation among insurance companies, and then you say to yourself, well, one of those insurance companies is unwilling to pay or unable to pay, is obnoxious and won't pay. It can pay, it could pay a partial. Who picks up the difference? And the risk is clearly on Fuller when it is buying the insurance to make the proper choice. And that the cases are absolutely uniform. Every court in every jurisdiction to consider this issue has determined that the policyholder is the only one that could fairly bear the risk when it is buying insurance. It chooses the policy terms. It chooses the premium it wants to pay. It chooses who it wants to do business with. Presumably, a large company in the company of its broker is making an intelligent judgment against with whom it wants to do business. We know from advertisements on TV, when insurance companies are selling themselves, they're selling their reputation. And here, Fuller chose not to buy insurance policies from our clients for those years, but from somebody else, and it is kind of perverse in our market system to say, well, I'm not going to pay you the premium at that price. I'm going to buy it from someone else, and if they fail, I could still collect against you. Yet that is exactly the argument that is being made here. It is not an appropriate shifting of the risk for an insurance company in one year that has not agreed to assume the risk to take on the responsibility for the ongoing insolvency of another insurance company under their insurance policies. That's not how it works. Fuller could decide who it wanted to buy insurance from. It could have decided to buy more insurance in those years. It could have decided to buy drop down insurance in those years. It has those options. The one thing we know for sure is that an insurance company in 1979 or 1978 cannot determine who Fuller is going to buy insurance from in 1980, 81, 82, 83, 84. So the two issues are, did injury happen? And who is the appropriate bearer of the risk? And that indeed is the foundation of the Woodale, what's called the unavailability exception, which says when you can't transfer risk at all, the allocation system doesn't work, and that's why we have this unavailability exception under Stonewall and several other jurisdictions. In all these cases, this court can look to those, what is really a well-developed body of case law. No one has recognized insolvency exceptions under that case law. They have recognized the unavailability exception. The only other issue is when there's a defense duty, which has a very different foundation. We sometimes see that where you have a duty to provide a defense, you can come up with a different rule. Time's expired. Thank you, Your Honor. Ms. Michaels, do they have any time left? Katie has two minutes and one minute second. Okay, thank you. Ms. Hunt? With regard to the number of occurrence, this court does not need to guess what Minnesota law, what Minnesota courts would do under these circumstances. The Minnesota Court of Appeals is clear. It's in accord with the Minnesota Supreme Court's decisions and it's being followed to date as most recently in 2014, February 2014, in the asbestos injury coverage litigation that's been assigned to one state court judge in Minnesota. Now, Fuller has the burden of proof to satisfy that it meets the self-insured retention. It was Fuller who decided to make the argument, and the sole argument, that the idea that the manufacturer, that there's one occurrence and it's the manufacturer. That is directly contrary to what the Minnesota courts have ruled. The Minnesota courts have ruled that it is not the manufacturer, but rather it is the exposure with the resulting injury that is the occurrence. I heard H.B. Fuller's counsel this morning say that while NSP was based on discharge, and that's true. It was based on discharge of contaminants into one site, one occurrence. Here we've got H.B. Fuller manufacturing a multitude of products under product line that are going out where there's people being exposed at different times, different places, different circumstances. And under those circumstances, the exposure is each an occurrence. That's what the Minnesota courts have held in the silicone implant litigation. There is nothing to the contrary on that. And so based on Minnesota law, as applied to the exact fact pattern that's before this court, Judge Tonheim had it wrong and that Judge Tonheim should be reversed on the determination that there was only one occurrence. Thank you. Thank you very much. Well, this is an interesting and complex case in particular, trying to anticipate what the Minnesota Supreme Court, where it is at any given time. But we'll do our best. We'll be back to you in due course. Thank you very much.